Good morning, your honors, may it please the court, Mr. Lieberman, Mr. Jaeger. My name is Bill Swinford. I represent the defendant, Steven Boyd Washington. I raised three arguments in my brief. I would like to address them in reverse order, and I would like to start with the multiple conspiracy construction failure to give it by the trial court in my variance argument. I would like to start out by saying I believe the standard of review for Mr. Washington with respect to this would be de novo. The United States did raise in its brief some question of whether I at the trial court offered the multiple conspiracy construction. I believe I did. I joined in the offer of it by Ms. Hughes, and it's found in the record, 618, the fourth day of the trial, pages 197 through 209. So I believe that the appropriate standard of review for Mr. Washington is de novo. We look at a standard of review particularized to questions. So for what issue? With respect to the multiple conspiracy construction. I believe a good place to start this discussion would be for the court to look at the three separate indictments that were in this case. The first one was in July, just after the arrest of two of the defendants who were caught with drugs or drugs that were purportedly delivered or picking up money. Then there was the second indictment, which is the first superseded indictment. It came two months later, and it named those defendants and the Kentucky defendants. And there are a lot of Kentucky defendants. The third indictment, the second superseded indictment, names dropped the Kentucky defendants who would all come back and testify at the trial of Mr. Washington and Mr. Campbell, and adds four or five different defendants. By my count, there are at least three and perhaps four conspiracies in this case. A good discussion of that is found in the briefs, but the first one I would mention is the conspiracy of Sheila McCarty and Tammy Martin. And that conspiracy had nothing to do with the charge conspiracy. Sheila McCarty and Tammy Martin both testified at the trial. They testified that they did not know the linchpin and all the conspiracies, the other three, and that would be James Martin and Leslie Martin. And I think there was evidence that Sheila McCarty actually had gone down to Florida and obtained pills on her own through scripts that perhaps she had and came back to Kentucky and did sell them to an undercover agent. And that's how she was, you know, charged in the second indictment. Obviously there's the conspiracy that would have everybody, the charged conspiracy, and that the government chose to put Sheila McCarty on at the trial. They could have chosen not to put her on at the trial. I think it was pretty clear that so they kind of are hoisted on their own petard. If they were going to put her on in the trial to testify, as with these other defendants, then they perhaps should not have objected to the multiple conspiracy instruction that the defendants requested the court to give. So, Mr. Swinford, I am looking at your, I think I'm looking at your proper brief and I do not see instructions in the list of issues appealed. Well, what we, the argument that I made in the brief was, the third argument of the initial. You want a standard of, an error standard of review, right? A de novo review with regard to that particular issue. We just agreed to that. But I don't see that issue in your list. I'm only looking at the index, but I don't remember seeing it at all. I think you're correct, Your Honor. We just put forth the argument that the multiple conspiracy instruction should have been, you know, given by the court. We advanced that, you know, gave reasons why we thought it should, that it should be... But did you give this? You said you set forth reasons for that, for that instruction. In your brief? I think they're in the brief, Your Honor. It just does not appear in the index that I didn't see it and I don't see that standard review. I mean, the third argument, like Judge Cook is saying, you're talking about the indictment of variance from the indictment, which, and I'm not wrong, is a different argument than saying that's a front-end sort of disparity and you're saying you should have gotten an instruction on the back. Well, Your Honor, it is in my reply brief. If you will look in the reply argument, I didn't... You can proceed with the argument, but recognizing that we'll be looking to the arguments made in the brief as supplemented here today, right? That's correct. Well, in my reply brief, I do adopt all the, you know, Mr. Campbell's brief and argument. I do adopt that and then I go on to state that the district court heard when it failed to give the multiple... I see. ...conspiracy instruction and I go on to try to examine three Sixth Circuit cases, the U.S. v. Adams, which is the boat-buying case from eastern Kentucky, which everybody in Kentucky is familiar with, and two unpublished opinions, which I have cited pursuant to the Sixth Circuit from the cases I've been able to examine, that there is a...it seems like a preference or they recognize that a multiple conspiracy instruction should be given by a trial judge if...for the jury to decide the factual dispute when evidence is presented that there is more than one conspiracy. I don't understand why you're arguing this instead of the variance issue that's in your blue brief. Well, I think they're bound together, Your Honor. Is one preserved in...I mean, did you...did you...were both of these asserted in the district court or only one or neither? Well, the multiple conspiracy argument was asserted in the district court, Your Honor. Well, in what form, though? I mean, because we have two forms, right? Variance and multiple...hey, Judge, I need a multiple instruction. I forget offhand. I believe it was more... Severance. Yeah, there was the severance argument, which Washington made six motions for severance, which were denied by the trial judge. And then there was the multiple... Probably six pints. Yes. Right? Yes, they denied six pints. And I will address that briefly if I could. That was... Mr. Campbell was representing himself pro se when this case started at the trial. Standby counsel was eventually substituted for him. How Mr. Washington was prejudiced by the failure of the trial court to grant the severance, which one was the continued delay, but mainly there was a motion in Lemony at the start of the trial where the trial court, you know, cautioned the government's attorney and Mr. Campbell not to make any reference to my client as bear until and unless the government was able to make that connection. And the government did make one slip up and I objected and he was cautioned and didn't do it again until we put on the proof. But right out of the box, Mr. Campbell stands up and calls my guy a bear when there had been no evidence that he was, you know, bear from anybody at that time. Much later, I think the second day, but he continually referred to him as bear every time he cross-examined anybody. So... I can understand how you'd be upset about that. Well, it was. And, you know, that was one of the problems going into a trial with somebody representing themselves pro se, you're going to have that, perhaps have that issue because a lay person did not know. But... Did you... You were trial counsel? Yes, Your Honor. I'm just curious. I mean, did you object or did you just decide you didn't want to draw attention to it? That was... Hard to object to a pro se person doing it. I didn't object initially because I didn't want to draw attention to it, but it got so bad I had to object. And Judge Kaufman cautioned. Good long speaking objection there. Your Honor, there's no proof whatsoever there. Yeah. So I did object. But are there any further questions? I don't... We'll... I don't know if you reserved rebuttal time. Yes, I did. So we'll hear from you then. May it please the Court, my name is Stephen R. Jagger and I represent Freddie Campbell Jr. Unlike Mr. Washington, Mr. Campbell did request the multiple conspiracy instruction. That request was denied. The standard for review for him, I believe, would be for an abuse of discretion. However, I'd like to start my argument with the sentencing phase. I think that's a much clearer issue to present to the Court. Judge Kaufman presided over this trial. Judge Hood was the sentencing judge. Judge Hood's sentence of 120 months on each count was procedurally unreasonable. It was based on an erroneous calculation of the criminal history category. And the standard of review on this one is for clear error. The sentencing judge based the criminal history category on a calculation based on the fact that two prior convictions were separated by an intervening arrest. Judge Hood? The government concedes that's not true. They do. That's off the table. Okay, great. That takes us to the second part of the argument and that is under 4A1.2. You didn't have to look, they're still counted separately unless they were sentenced on the same day. The government takes the position these cases were not sentenced on the same day. We believe the record shows that they were in fact sentenced on the same day, that being February the 17th of 1995. Just as a factual matter, is it true that the district court simply did not focus on this question? We don't even have a finding as to this. He did not. He did not make a finding. He just simply, at the sentencing hearing, when the issue is raised about the intervening arrest, Judge Hood turns to the probation officer and says, was there an intervening arrest? Probation officer says yes. He says objection overruled. They move on to the next issue. This was never addressed by the court because it was not on the table at the time. However, if you look at the record, you have to look at 4A1.1, 4A1.2 in the author's notes and commentary where they recognize the fact that one of the big problems that district courts have is the interpretation of the state court records because you have to deal with 50 states and territories and all that. If you look at the government's position, they are interpreting records based on clerk's notes, based on the memoranda in this 199-page record. We say you don't get that because the only uncontroverted document that does not require any interpretation is an affidavit by the Department of Corrections in Florida and a sworn affidavit in support of a motion to revoke probation sometime later where the probation officer says approved by his supervisor under oath the 17th took place on both cases in question, February the 17th, 1995. That calls for no interpretation. It's there. It's not subject matter to attack at this time. So you're saying somewhere in the fossilized layers of the record in some other case there's an affidavit which says... It's in these cases. Yeah, I know. It's like another case within this case. The record says that there's an affidavit that says years before this defendant was sentenced on the same day for the two predicate offenses. Yes, sir. The affidavit makes reference to both underlying cases. What happens is... I'm going to call them cases 44 and 45 that coincides to the pre-sentence investigation report. It's record 589 at page 2901. That's a lot of cases. It's a lot of cases. There's a bunch of them. So it doesn't make it correct. It's procedurally unsound. Because they... There's a date of arrest of December 94. Sentencing is deferred to February 95. The second case resolves itself because the sentencing is February 17, 95. In one case, we have a judgment from the court that shows the sentencing dates right on there signed by the judge. We don't have that in case... The first case, 44. Assuming we agree with you and the record bears out what you say, which I think... I've looked. I think it does. What's the upshot of that? The upshot is we count 2 cases are assigned 3 points. Judge Hood assigned them 6. Total points, 12. Category 5. He's sentenced on Category 6 because he added 3 extra points. I'm looking for numbers. I thought that the primary issue was grouping and not grouping. Yes. And so... So what are the months? What sentence differentiation? I understand. He received a sentence of 120 months. A Category 5. Assuming that he's correct at Base Level 24. It would be resentencing. So the range... 92. The prior range is 100 to 125. You suggest that it would... 92 to 115. And the sentence imposed was 120. 92 to 115? Yes, ma'am. And that reflects... That reflects Base Level 24, Criminal History Category 5. Mm-hmm. Now, we also have a problem with the Base Level 24. Uh... And that is sort of tied to the multiple conspiracy argument. Judge Hood finds that at sentencing, there's a lot of discussion about the proper pill count. Is it 300 pills or is it 400 pills? I understand the difference between the pill count necessary for determination of guilt and the sentence ability that the court has and the sentencing accountability under that policy. I get that. Judge Hood, the PSR says 700 to 800 pills was the proper pill count. Base Level 26. Defense counsel, Ms. Hughes, says, no, that's not correct. It's 300 pills. Base Level 22... instead of 26 called for in the PSR. Judge Hood splits the difference. 400 pills. Well, he didn't split the difference. He had a good reason for 400, which was that's what your client meant to sell, and then... No. I mean, there was some change in the deal, but your client had picked up 400, intended to sell 400 to somebody, and I can't... It's hard to remember. He was going to be the Passover recipient of 400 pills in the one conspiracy. I mean, the court didn't just say, I'm going to split the difference. I mean, it had a reason. Correct. Why was it wrong? Well, where the error comes in is he has the duty to look at all the involved in conduct. Correct? Could we interrupt just for a moment on this topic? Because your client... It looks to me like your client proposed the district court find him responsible for, quote, 300 to 400 pills as the 400 pills were intended for Campbell. Intended for. That's what he says in court. What she says is... Judge Smith had already said he was going to... I think when she said that, that there was going to be a 400-pill count utilized. She continues to advocate, however, that she said, I would like to use the 300, which was the deal he was making that night. That's a direct quote from her response to that. Likewise, in the PSR, she makes that same reference to June 8, 2011, which is count 11. So I'm going to get to that real... I'm going to get 11 seconds, but I'm going to get that real quick. Could it be fairly said that your client provoked that pill count with that objection? Citing a range, 300 to 400? It could be. Under the invited error doctrine? I don't think invited error applies in this, but I think she keeps returning to the fact we think it should be 300. There was a discussion about 300 to 400. She keeps coming back. She said it in the PSR. She says it again at the sentencing hearing that the pill count should be 300. And that makes a difference of how many months? It would drop at the base level of 22. The range being? That depends on which criminal history category. That's okay. We'll do it. If it's 22 and 5, it's 77 to 96 months. Okay? Not come back on multiple conspiracies. Thank you for your argument. Thanks. Thank you. Good morning, Your Honors, and may it please the Court. Dave Lieberman for the United States. The defendants here have not established any error in the District Court's trial rulings and sentencing determinations. We ask that the Court affirm the judgments below. Let me turn to the variance points and the multiple conspiracy instruction in that order. You're first arguing Washington. Yes, I'm sorry. Mr. Washington, the government's confession is Mr. Washington is raising a variance objection. Okay. Mr. Campbell, Jr. is raising the multiple conspiracy instruction. Okay. To the variance point, the standard of review here is that the variance occurs only when the trial evidence... only when the trial evidence can reasonably be construed as showing only multiple conspiracies. And the guideposts that this Court uses to evaluate variance claims all line up for the one overarching conspiracy. Of the eight conspirators listed in the second superseding indictment, all shared a common goal, illicit distribution of oxycodone. The nature of the scheme was a drug distribution enterprise, which this Court has recognized over and over again is a joint enterprise. People at the top, people at the middle, people at the bottom. Folks don't need to know or may not be aware of all the identities of everybody along the chain. Folks may not be aware of the full nature of the conspiracy's activities, but everybody falls under the same umbrella. Finally, all the eight conspirators here overlapped in some fashion. That's the third guidepost. The chain that the government focused on at trial, Kevis Campbell and Stephen Bear Washington were funneling pills to James Martin, who then sold them with his wife, and Freddie Campbell, Jr., in and around Clark County, delivered the proceeds to Mike Marshall. That's six out of the eight right there. Now, what the defendants, what Mr. Washington does, and actually, and Mr. Campbell, Jr. does this in the multiple conspiracy instruction point, is tries to isolate those two other conspirators, Von Schell-Lindsay and Freddie Campbell III, as part of this completely separate and discreet. Their theory is that Kevis Campbell was supplying them in an isolated fashion down the line. And the evidence does not bear that out. Kevis Campbell was supplying both James Martin and, under the defendant's theory, Freddie Campbell, Jr. The government presented evidence that Freddie Campbell, Jr. had also delivered pills to James Martin. Finally, at the end of this allegedly discreet chain is Mike Marshall. Von Schell-Lindsay and Freddie Campbell III were selling these pills to help bond Mike Marshall out of jail. The same Mike Marshall that was at the end of the main chain that the government was focusing on. Now, under the standard of review here, the jury could easily find one overarching conspiracy. Now, that test, you know, could the jury find one conspiracy, that only applies to the variance argument, not to Mr. Campbell's multiple instruction argument, right? Absolutely right. We're here, on that point, don't move to that, we're here on an abuse of discretion. And the district court did not abuse its discretion. The standard is a multiple conspiracy instruction would be appropriate when, within reason, the jury could find multiple conspiracies. And I think the defendants are, and Mr. Campbell is outside of that reasonableness box. And here's why. It all comes back to this court's decision in United States v. Caver, which I think has very similar facts in this case. In that case, this court said that folks in a drug distribution conspiracy who are on the same plane of a distribution and linked up by a common supplier are part of the same conspiracy. They don't have to know each other, they don't have to coordinate with each other, they don't have to set prices. They're a supplier. Yes. In fact, in Caver, at page 236, the panel cited a previous decision of this court, Kelly, where the court found that a supplier in San Francisco was part of a large conspiracy with suppliers in Los Angeles and Washington, D.C. They didn't know each other at all. They weren't aware of the other's activities, but they were all linked up by the common supplier. So if you take the defendant's theory of the case, that Kevith Campbell was supplying to this allegedly separate group, the problem was that there was clear evidence and undisputed evidence that Kevith Campbell was also supplying to James Martin and Freddie Campbell, Jr. Under Caver, there's only one conspiracy. And the assertions that... What's their common goal? The illicit distribution of oxycodone. So if... If the supplier in Florida runs into somebody in a bar who's an oxycodone addict and the supplier gives him 100 pills to go sell in Naples, now that is part of Mr. Campbell's conspiracy? It may be. It would depend on the facts and whether or not the conspirators are on the same horizontal plane. If it's just sort of a one-off transaction, I think the government would have a tough... So it has to be... That's an element of this... saying it's one conspiracy that these guys are in the same plane? Yeah, and that... At least that's how the court in Caver phrased it. And in here, these defendants were mid-level distributors. The... Von Schell Lindsey and Freddie Campbell III were allegedly mid-level distributors as well. I think we'd have a lot more problems if sort of the focal point was not Tevis Campbell at the top who is a supplier but somebody in the middle or if there was some sort of mismatch in the lines. But everybody here is on the same horizontal plane. And all the assertions that they make, separate and discrete conspiracies here, we didn't know each other. We weren't setting prices together. We weren't coordinating each other. This court has said in case after case that that does not defeat a single over-action conspiracy. So faced with all this, the district court could not have abused its discretion in denying the instruction. And... Is the easier argument for you on this the prejudice argument, do you think? I don't want to say it's easier. I think it's equally successful. Uh... What did you do? Tried to trick you there. Yeah, yeah. So this court has only recognized three types of prejudice that come from variance claims as well as multiple conspiracy instructions. The same prejudice categories apply. One, unfair surprise by the evidence related to the allegedly distinct conspiracy. Number two, were the defendants convicted of a substantive offense committed by somebody else? And three, spillover. Now, let me walk... I'll take Mr. Washington first and then Mr. Campbell, Jr. Mr. Washington has never claimed any unfair surprise here. Number two, he has... He was only convict... He was not convicted of any substantive offense in this case. So, second category doesn't apply. And third, there are no spillover concerns because his sole defense at trial was, I am not the Florida supplier named Bear. That was it. All the evidence relating to what the government believes are very minor participants, the Von Schell-Lindsey evidence and the Freddie Campbell III evidence  this mistaken identity claim. And so there's absolutely no basis to believe that these points of evidence somehow tainted the jury's deliberations of Mr. Washington's defense. Let me turn to Mr. Campbell. He can't claim unfair surprise because he actually elicited most of this evidence regarding Von Schell-Lindsey and Freddie Campbell III either on cross-examination or his defense case in chief. Second category, he was not convicted of any substantive offense by another person in the conspiracy. Third, no risk of evidentiary spillover because the vast majority of all the evidence in this case talked about the conduct of these two defendants, not Von Schell-Lindsey, not Freddie Campbell III. And furthermore, and this is the point that the Kaver Court mentioned, all the witnesses when they were talking about these participants said, Freddie Campbell Jr. is not involved. This was separate and apart. And that shows that it makes it very unlikely that the jury was somehow going to bleed everything together and assess Mr. Campbell's culpability by reference to these couple transactions. Well, let me ask you because I know we're pressed for time with a lot of issues. You just mentioned that Mr. Washington sold the fence at trial. Was it? He wasn't there. Yes. And yet, and he moves to sever a whole bunch of times. And then at trial, we have Mr. Campbell pro se, you know, just spraying all over the courtroom. Bare, bare, bare, bare, bare. Why isn't that really prejudicial here? Well, I'm actually not sure that the jury is going to look at Mr. Campbell's  as, that this is bare as evidence as compared to, let's say, if a government agent was doing it or the prosecutor was doing it. I mean, isn't he worse? I mean, he's somebody that, you know, the jury is going to think actually knows this individual that he has, you know, true knowledge like a witness and he's calling him bare very casually and they're going to assess his credibility, frankly, aren't they? You know, about whether, yeah, it does seem like he knows him. And there should have been a more clear objection at trial. And I'm looking at, when I have a counsel table, document 6153630 where this comes up pre-trial and Mr. Campbell counsel asked the district court not to refer to him, excuse me, Mr. Washington asked the district court not to refer to him as bare. He said, I understand that the government's witnesses are going to do that. There was actually no request for the same of Mr. Campbell. Now, perhaps I'm missing something in the record. You're right. And then, in that case, it's really hard to see that the district court abuses discretion on the motion to sever if this, the precise issue that you're raising wasn't actually raised to the district court. The fear that Mr. Campbell as a pro se defendant was going to say bare all over the room justifying at that point a motion to sever. And, these motions made after Mr. Campbell started calling him bare in the courtroom? I believe, I don't really, not contemporaneous to that. I believe that one of the defendants made a motion to sever towards the end of the trial unless this circuit requires. So, there wasn't one in the relatively close proximity to this bare business? I'm actually having trouble recalling that there was any objection either in the middle of trial or at sidebar. I could see him not objecting, but I could see him at a break saying, Your Honor, I renew my motion to sever. This has got to stop. This guy's out of control. I want out. It's not fair. I don't recall at this, standing up here, any discussion at sidebar about Mr. Campbell's reference to bare when he was pro se. And he was, he, standby counsel resumed her role, I believe, on the second day of trial. One day of this? Sorry? One day of the pro se trial? I think it was actually less than one day, but yes. Let me go to the sentencing challenges that Mr. Campbell makes. I'll do the drug quantity first and then I'll go on to the criminal history score. The PSR came back recommending seven to eight hundred pills. Counsel for Mr. Campbell says the proper number of pills should be three hundred to four hundred. Expresses a preference for the three hundred, but I think at least as I read it, would say that the proof would appear to support the four hundred as well. And then the second error in the district court's finding because on page this is transcript document 616-3995 through 3998 recorded phone call between Mr. Campbell and our cooperator Mr. Martin where he Mr. Campbell has just been told he's not receiving four hundred pills. And he writes you said three it should have been four it should have been four he, Mr. Washington was telling me four our cooperator says sorry I sold them off Mr. Campbell says well what about Kevis' pills our cooperator they're all gone I got rid of a thousand before I even got here Mr. Campbell god damn that shows Mr. Campbell is attributable to four hundred pills that was the original agreement he had no intervening arrest I have some sympathy for the district court here because this precise objection was not in the objections to the PSR it was just raised in the heat of the moment which objection about I'm sorry the defendant's objection about the double counting it was not in the objection to the PSR are you saying you're conceding on appeal that the basis of the district court's career offender designation was incorrect I'm sorry the criminal history score was incorrect are you talking about the objection to that the incorrect thing or the objection that they're making I'm sorry I was just got my tongue tied so what happened was yeah I'll try to untie myself the objection about whether or not these two Florida convictions should be counted separately or together was raised in the middle of the sentencing hearing which is why we have such a sparse record for the district court to walk through 4A 1.2 the government concedes that based on the records we have there was no intervening arrest and the district court did not have the opportunity to walk through the remaining two now there's no dispute that these two Florida convictions resulted from separate charging instruments so that's not on the table the only  I have with this agency because the document that Mr. Campbell's referencing is a probation violation report that not from the court and it was not from the sentencing court and it was not contemporaneous to the sentencing dates that are at issue here whereas the government is looking for the first fraud the official clerks minutes and the second fraud for the sentencing judgment and these are the type of records that courts take judicial notice of the time we think that that could be a basis to affirm the district the problem here is that the district court never made a finding it's one thing if the district court sifts through all this and you know there's a hearing and everybody argues it and it really gets focused on it it's a hard issue and for us to do that de novo here I mean if the court has paused given the record the appropriate remedies would be a remand and the district court can make these factual findings in the first instance and make a determination a full and if the defendant raises I'm happy to sit down I thank the panel fine thank you Mr. Leibroom who's up you Mr. Swinford all right very briefly with respect to the severance argument I can perhaps enlighten the court I don't think there was a contemporaneous objection at the time you mentioned right next to Mr. Campbell at council table during this time I know it's not in the record but he knew not to call him there I did make the motion to sever at the conclusion and I think that was one of the prejudices that happened now with respect to the variance argument there's something that didn't articulate initially and that is and I'm not able to find any law on this the second indictment which is the first superseding indictment it contained a number of conspirators there's 15 total conspirators charged in the three indictments there's only 8 charged in the second superseding indictment most of the Kentucky conspirators were dropped off the second superseding indictment and perhaps and I don't know I don't know but I can tell you this you know if you look at the briefs all the evidence in there Sheila McCarty and Tammy Martin were not part of any conspiracy to do anything with James and Leslie Martin I think Tammy's kin you know Sheila was going down and getting the pills herself they're mysteriously dropped I couldn't find any case law to address what happens between the superseding indictment when a number of the other defendants are dropped off but I can tell you this they all pled guilty all their judgments bear that case number of the case that I'm up here with Mr. Washington Thank you Thank you Picking up on where he left off the authority he's looking for is in the Swofford opinion footnote four it says whether or not the and Timmy Martin were co-defendants in this in this case they dropped that on the pleas that does not remove their status as co-conspirators as to the government's reliance on the CABR decision CABR decision is very different than what we have here in CABR they find out that the multiple conspiracy instruction was incorrect because the conspirators pulled money to purchase drugs cooperated to evade law enforcement worked together repeatedly engaged in high volume drug sales they were working as a group they did not have these separate conspiracies in place Judge Kaufman relied on the Warner decision there was in a clear or a plain error analysis at the time of the trial she goes through and she recites a lot about the footnotes in Warner and all these similarities that she thought may have existed the essence of Warner in the end result when you're a trial attorney is that Warner does hold that when the evidence is such that the jury could within reason find more than one conspiracy the trial court should give the jury a multiple conspiracy instruction Mr. Campbell asked for the instruction and it was denied that takes me to where I want to get to about the pill count relevance Judge Hood has to consider relevant conduct at the time of sentencing his relevant conduct is 400 pills which goes back to count 11 June 8, 2011 arrest on the grounds that not some indication that the jury could have found that the conduct also consisted of multiple conspiracy behavior okay Mr. Jagger thank you we have your argument thank you I note that both you and Mr. Swinford have accepted these cases on under the Criminal Justice Act and the court thanks you very much for your input and  it thank you I'm pleased to be here    . . . . . . . . . . . . . . . . . . .